Good morning ladies and gentlemen. We have six cases on the calendar this morning. Two patent cases from the District Courts, a contract case from the Board of Contract Appeals, a Veterans Appeal, and two Government Employee Appeals. The last three submitted on the briefs will not be argued. Our first case is U.S. Philips v. Iwasaki Electric Company, 2009-12-52. Mr. Groombridge, this case seems to be about mercury vapor lamps. I trust both of you will illuminate the issues well for us. We will do our best, and I will start off by saying that I would like to reserve two minutes, please, for rebuttal. I will also start off, my colleague has brought with him some mercury vapor discharge lamps which may come in handy during the process. Just don't spill it. So there are three issues here, obviousness, inducement, and damages, and I'd like to take them in that order, starting with obviousness. And the key point we would like to make with respect to obviousness is, with utmost respect, we would ask that this Court focus on Claim 1, the only asserted claim of the patent, because in our view what went wrong below was that the decision-making there parted company from the claim and ended up being decided, the case was decided on issues that really have nothing to do with what's in Claim 1. And what we see here, there's nothing in Claim 1 that was not already known in the art. The premise of the entire patent, as embodied in Claim 1, is that if you take this known device, the mercury vapor discharge lamp, and you increase the operating pressure to 200 atmospheres, 200 bar or above, you get improved light output. That premise was already explicitly known in the art in the primary reference. Interestingly, one thing that you all don't raise, you said 200 or above, but that's not what the claim says. The claim says above 200, higher than 200. And I was very surprised because Elenabas says only up to 200 bar, so there is no period of overlap, but I didn't see anyone actually ever make that argument. I'm not sure that's quite correct. There's a small, but in this context, significant difference between bar and atmospheres. The claim says bar, Elenabas says atmospheres, and atmospheres turns out to be fractionally higher than a bar, so that 200 atmospheres is about 201 bar. In addition, Elenabas actually, and this is at 6828 in the record, said it goes up to 300 bar as an express disclosure. In other embodiments, not the embodiment that you refer to for purposes of the range. Correct, but I would say perhaps not embodiment, but more as a general principle. In other words, that statement is in the very introductory chapter. Well, I don't want to waste your time. You convinced me with the bar atmosphere thing, so I'll let you go forward. But on that point, in that introductory statement, it says, okay, if we increase pressure, we get improved light output all the way up to 300 bar, and that's undisputed. There's no dispute that that's in fact how the invention was made. The inventors took the book off the shelf, and they said, this is 2075 in the record, you see in the book of Elenabas what happened when pressure increases. That's exactly what we did. That's exactly what we did. And there's no dispute that Elenabas discloses every single limitation of claim one. The district court erred there, right, because the district court seemed to conclude that Elenabas didn't disclose a small amount of halogen. Exactly. Yes, the district court erroneously stated there was no disclosure of halogen, and there's no dispute that that's wrong. The only thing that Elenabas doesn't disclose, and the only reason this is an obviousness case  and what it does say is you use a small amount just as in incandescent lamps. And we know from the Phillips expert, Phillips expert testified, because this was a fact that was useful to him on infringement, that he could point to 100 patents regarding incandescent lamps that would show a range squarely overlapping with the claimed range here. That's 3945 on the record. He says 100 patents, he says, the range is typically two orders of magnitude, the units are micromoles per cubic millimeter, and he says the claimed range here is 10 to the minus 4, 10 to the minus 6 at the low end, 10 to the minus 4 at the top. In the incandescent it's the same, but one order of magnitude higher. 10 to the minus 5 at the low end is typical, and then 10 to the minus 3 at the high end. Squarely overlapping ranges. But aren't the operating conditions considerably different between high pressure mercury vapor lamps and incandescent lamps? No. And does that have an effect on the halogen? No, and I think the evidence is unanimous here that the way the cycle operates is exactly the same. Indeed, the halogen transport cycle was invented for use in incandescent lamps. There's no question, as far as I know, that it operates the same way in mercury vapor discharge lamps. And even if that were so, there's another secondary reference, the Japanese 871, that discloses a range that directly abuts the literal claim and overlaps with the expanded scope of the claim, and that's a mercury vapor discharge. They use the word secondary, aren't there? Secondary considerations here. Aren't these lamps really superior? I think there is absolutely no doubt, Your Honor, that Philips eventually created a great product that had a dramatic effect on the marketplace. No doubt at all. The problem is there's equally no doubt that that success was not attributable to anything that's in Claim 1, because what's in Claim 1 is a restatement of what's in Ellenbosch. Mr. Woodbridge, let me ask you about this inducement. Absolutely, Your Honor. The theory is equivalence. Correct. Who knows what's equivalent until the courts say what's equivalent? So you're talking about inducement of equivalent, inducement of infringement by equivalence from out of the country. Correct. You've got this Japanese invalidation. There's a lot of stuff here. What do you have to say about all that? Your Honor, I would go exactly where Your Honor started, that this is an equivalence case. We've got an intent question. How does one know? How do you intend to infringe what you don't know, what isn't within the scope of the claim? Precisely. And we have a whole lot of problems with evidence that did go to that issue being excluded. So what we have here, frankly, in our view, is a tremendous unfairness. The focus of this case... Well, you're not suggesting, are you, that whenever the infringement must be by the doctrine of equivalence, there can never be intent to induce infringement. No, I'm not suggesting that in the least. What I am suggesting is that in an equivalence case, an equivalence and inducement case, so we've got, if you will, a sort of squared problem of proof on the part of the plaintiff. The plaintiff had better come forward with some evidence that there was intent to cause infringement under the doctrine of equivalence, and here there is no such evidence. And, in fact, what the district court cites... The district court says in the decision on post-trial motion, so there's ample evidence, and then cites seven pages of testimony from Phillip's technical expert, a doctor based in England. That's the evidence that is cited regarding... What was cited was, the district court at least characterized that evidence as an attempt was being made to design a lamp that would be, in fact, insubstantially different, a design around that would be able to capitalize and achieve the same market as the patented invention. And why doesn't, if it turns out, really you were successful in designing something insubstantially different, why isn't that evidence of intent? Well, because I think what we've got to focus on here, Your Honor, is the intent, and the intent aspect of that was certainly an effort to... We submit a successful effort to design around, and in the dialogue that after there was a notice letter from Phillips and before the lawsuit was filed, among the excluded evidence you would see, it was Sarkey laying out its position that in our design around we have an amount of halogen that is twice the upper limit of these claims and 20 times all the working examples. We think that our product functions differently and it's outside the scope of your patent. And that evidence, which we would submit is directly probative of their intent, was excluded. What we have instead is evidence that, well, because it's an equivalent, the Phelps technical expert says it's an equivalent, the district court then says, because it's an equivalent, everyone would have known it was an equivalent and therefore you must have had intent. And we submit that that is just not enough. It's not a foundation on which you can build intent. No, but the jury made the finding of intent, not the district court judge. The jury made the finding of inducement. The jury did. And the jury had in front of it everything except for, I understand your complaint to be over the not supplying the jury with the district court or the federal circuit opinion. Well, I'd be happy to talk about that, but the district court then, of course, ruled on a Jamal motion and that's what I was referring to. But can you really dispute at this point inducement post-federal circuit decision? Can you really stand here and say when we continued to sell to people who were directly infringing after the federal circuit had issued its prior opinion in this case, that we were at that point of a reasonable belief that we could not be found liable for infringement under DOE? Absolutely, Your Honor. How? How? Because the theory of inducement was never laid out until the trial. And the theory of equivalency was never laid out. What was laid out, and I would invite the court to look at this, in fact, page 7778, almost the very last thing in the record, interrogatory response by Phillips, December of 2004, that lays out why they contend there's infringement. And there's five arguments, four of which are literal infringement. At the end is the equivalence argument. The paragraph begins with the word finally. It says finally, even if you don't like all the others, there's infringement, there's equivalence. And the reason is, and I would invite the court to look at this, the reason the theory of equivalence is given is because you have bromine present. But I'm not suggesting whether or not it was reasonable in 2004. The federal circuit opinion was issued in 2007 and Judge Lynn eloquently explains why there can be the potential for the doctrine of equivalence infringement of this range and remands for the court to look on a lamp-by-lamp basis to assess whether there is. Absolutely on a lamp-by-lamp basis. In other words, Judge Lynn eloquently expounds that and sends it back and says, the possibility of infringement under the doctrine of equivalence is not foreclosed here. This needs to be decided. That's very, very different from saying there is infringement under the doctrine of equivalence. It's just saying, as a matter of law, we cannot affirm the finding that there is no equivalence. Now, when was the Japanese patent invalidated, time-wise, in relation to the actions that are accused of being inducement? I believe, Your Honor, I can't answer that. I'm tempted to say 2004, but there was a decision of the Japanese patent office which was then eventually affirmed by the Japanese Supreme Court, I believe. And that process took a few years. But essentially, in the period between about 2002 and 2006, those proceedings were going on. Well, what I'm trying to get at is, is the Japanese invalidation relevant? In other words, if it occurred after the actions of which you're accused, then it's not relevant. It's not relevant to intent. Well, I think if the question is that there needs to be intent throughout the period, right, and that the intent calculus can change, which seems to be something that was accepted, right, that we're not taking a snapshot at the moment the lawsuit began, right, then, in that instance, it could be relevant. If, in this Court's view, the appropriate legal standard is that we do take a snapshot, right, and then subsequent events are irrelevant, I would certainly concede it can't bear on that. And just in the remaining moment, I would, if... Let me ask you one other question before you go off. The district court judge, I read the transcript, and there's a point at which Mr. Pegram is explaining an objection related to the judicial opinions, and the district court judge says to you, it sounds like this is something you ought to reach a stipulation for, go off and do so. And then he says, and if a stipulation can't be reached, somebody brings it to my attention and requests an instruction, I would say something like, boom. Well, I can't find any evidence of a stipulation, and the damages seem to go to the entire time period, but I also can't find any evidence that then, during the jury instruction point, you all raised it to the district court's attention like he expressly told you you'd have to do. Let me direct you all to page 4551. And there... ...the Court will see... 4551. 4551. And the Court will see the end of a colloquy on this very issue at the charging colloquy after the evidence and before the jury was charged, and in which the judge refers to the carve-out period and says, no need to worry about a carve-out period in this conference, that will be something we will take up at another time. I'm not ruling on the carve-out period today, you understand that. And this is part of the tremendous unfairness in our view. Iwasaki raised the issue, the judge said work on a stipulation, the parties were unable to do so, at the end Iwasaki raised it again, the judge said I reserve judgment, and then never ruled on it. It's not even mentioned in the ruling on post-trial motions. It just disappeared. And that, we submit, is a perfect example of what went wrong below. Was there any follow-up after this colloquy? There's a post-trial motion in which Iwasaki raised this very issue in the consolidated J-mole and U-trial motion, where there's a motion that says the damages need to be assessed in five discrete time periods, this carve-out is period number four. Is this a question of a carve-out of damages, or is this a question of whether there was infringement during a period of time  and prior to the appeal. So the question is, during that period of time, how could there be intent to infringe? That's a question of whether there was or was not infringement, not a question of whether there's a carve-out of damages. Well, I think you're exactly right, Your Honor. It's a question of whether there was the requisite intent such that there would be liability for induced infringement. That's an infringement question that should have been presented to the jury. Well, it's absolutely an infringement question, but the trial judge said, I am not comfortable putting judicial opinions, mine or that of the Federal Circuit, before the jury. Here's what I would like for you to do. Work out a stipulation. If we can agree that the jury will come back and say their damages are so many percent, or in fact so many dollars per unit, then they don't need to reach this issue. We, after the fact, can look at how many units were sold during that relevant time period, and we'll just deduct that. That's the carve-out. There will be no liability, because the assumption there was you can't possibly have the requisite intent at a time when a trial court has held you've won. You don't infringe on the merits. You can't have intent to induce infringement. And that issue was raised, preserved, and then ignored by the district court. It has never been decided. And that, we submit, is just plain not fair. What else could Iwasaki have done? And read the decision on the post-trial motions in vain. There's not a word, not a reference, nothing. Okay. Thank you. We will give you your full rebuttal time back. Thank you. And if the court has questions on damages, I would be happy to address those. Hearing none, I will sit down. Mr. DiMatteo? Good morning, Your Honors. May it please the Court. The jury in the district court found that this patent was valid, infringed, and a reasonable royalty of $28.70 was appropriate. This Court should affirm. Our arguments are set out in detail in our briefs, and today I want to just respond to some of the arguments made today by Mr. Groombridge, as well as if there's time to reply to some arguments. Were the damages in part based on the assembly rather than patented lamps? The damages was based on royalty per volt, per unit. These were sold primarily at the time infringement began, and for many years thereafter as complete lamp housings. There was a period of time, 2004, really it started in 2005, where Iwasaki made the business decision for whatever reason to sell the bulb alone to Epson. There was only one client that demanded just the bulb alone at a very cheap price. The royalty, though, was based on per bulb royalty. Did Iwasaki at any time sell complete projectors? No, Your Honor. Would it be proper to base the royalty calculation on the cost of the complete projector? Yes, Your Honor. The question is not whether Iwasaki does or does not sell projectors. The question is what is a reasonable royalty and what factors do you look into that? Phillips at the time recognized that this invention created an entire new industry. Gone were the big projectors that we may have all been familiar with that used to hit us in the heads from the airplanes and come down or at the sports park. Instead were these laptops, small projectors. This was a phenomenal industry that was going to change, create a whole new electronics business. Based on that, they said, well, what would projector companies who are selling these be willing to pay? What royalty across the industry would they be willing to pay? They said, well, one to three percent of the percentage of the projector, which translated to approximately $30. The record is pretty clear on that. The fact that Iwasaki has provided the key component, that bulb, that lamp, two projectors for that, certainly warrants a comparison to the projector price. My understanding was that damages request was premised primarily on an assumption of what a reasonable royalty might be looking at the price of the bulb or the bulb assembly and not the projector. Although I recognize there was testimony about the price of the projectors, it seemed to me that that was almost sort of a commentary to simply reflect that the royalty otherwise reflected by the evidence would not be disproportionately high in the context of the overall machine. Certainly, that's a fair way to look at it. The jury heard, and both the damage expert, Mr. Hoffman, and the business executive, Mr. Ford, looked at all the different factors. The prices that Iwasaki was selling the lamps at, the prices that projector companies would be willing to pay, the profit margin per lamp assembly and additional profits made by selling the power supplies, all of that was looked into this calculus to come up with a reasonable royalty, which the jury in this case did not give what Phillips was asking for, $30, but slightly higher than what Mr. Hoffman was asking for, $20. But that still leaves the question of whether, given the fact that Iwasaki never sold the completed projector, whether that calculation was really proper at all in trying to reach a conclusion as to what the hypothetical reasonable royalty would have been. Well, first, on its merits, it is proper because you're looking at the entire industry and what the industry was willing to pay. It makes no difference whether Iwasaki is making the projector. The question is, can we price the lamps such that include this royalty and that lamp manufacturers would buy it and use it? And the answer is yes. And comparing that to what the lamp manufacturers would then turn around and sell in their profits is certainly proper. What about liability for infringement? This question of equivalence, inducement, is it Japanese invalidity? How does all that fit together? Certainly, Your Honor. The validity of the Japanese patent is not relevant for two separate reasons. First, it's a Japanese patent that had different claims. It didn't even have the pressure limitation that we have here. But the judge didn't even admit that fact. If it had been admitted and adjudicated and said, well, this is an irrelevant issue, that's one thing, but it wasn't even admitted. Right, because the judge recognized the validity of a Japanese patent is not relevant to the validity of a U.S. patent. Well, it could be. On the merits on whether it's not. But in this case, it wasn't relevant. It had different claim language, different standards of law. Do we have an explanation of that? No, we don't. The judge did not articulate it. It was certainly laid out in the briefs, and he concluded appropriately that it was not admissible. More importantly, there are two other reasons. More importantly, one is a legal question. Does a state of mind, I believe that patent is invalid, is that relevant to inducement? I submit the answer to that question is no. There's a fundamental difference between the act of infringement and the infringement statutes and the validity statutes. And this court has made clear that you can infringe an invalid patent. What exactly is the evidence that was produced regarding inducement? There was a whole list of evidence that was produced, Your Honor. First, the jury heard that, oops, sorry, wrong picture, that I was talking new about the patent. In fact, I was stipulating. That's at A3721. Arasaki knew it was infringing. Epson, its biggest customer, repeatedly told them, you should take a license. There's a real serious problem with this patent. They presented no non-infringement defense at trial. Not once, not a word, did they say that their halogen range in any way functioned any differently than the claimed range in the patent. Zero, nothing. Well, their halogen range was 20 times higher than the working examples in the patent and several quite a bit higher than the actual literal claimed range. And you would expect somebody to come in and explain that somehow that means something, that that is substantially different. There is no evidence in the record that it was because, in truth, and Dr. Devonshire explained, that their halogen dosing achieved the same result in the same way and achieved the same function, way, and result as the halogen expressed in this case. Well, what about the period after the time of the district court's decision? Suppose that you were correct. There is absolutely no evidence that they ever for a minute had a good faith belief that they didn't infringe, which I find a little bit hard to swallow given that they convinced the district court that they didn't. So obviously they did believe they didn't infringe or at least at some point had arguments to support that notion because they did in fact convince the district court of it. So what about that time period post-district court? District courts now said no infringement. How can they not reasonably rely upon that? What is your basis for saying they can't reasonably rely on that opinion at that point to not be inducing after at least that opinion has issued? Our position never says that they could not. The problem for Iwasaki is they did not introduce any evidence to that effect. Well, they tried to, but the district court wouldn't allow the introduction of the opinions. No, but they didn't. No, that's not correct. What I'm saying is they agreed with the district court that the jury would not see the opinions. What happened here? No, no, no. They agreed with the district court that the opinions themselves, because the judge said, look, these opinions are confusing to us lawyers. I'm not going to subject the jury to them. But they didn't agree with the notion that the jury should be explained that they were found as of a certain date not to infringe and that there could therefore be no intent to induce in that period thereafter. Right. The problem that Iwasaki faced was one of causation. They did not want to waive the privilege because their trial counsel was the author of all their opinions, all their prior correspondence. We're not talking about opinions. We're talking about the district court's determination of non-infringement. I understand, Your Honor. For them to rely on it, they have to show some evidence, some executive. It's like a super opinion of counsel, that district court decision. Erroneously decided, but it's like an opinion of counsel. It's a real good one because it's coming from a district court judge. But it's entitled, you have to show causation that somebody relied on and to show reliance on that opinion that they thought they did not infringe. They would have to waive the attorney client privilege. How could they not be relying? How can we not recognize as a matter of law that once the district court says, and the opinion is not unreasonable. This isn't a quirky opinion that you look at and say, wow, what a crazy opinion. It might have ultimately been wrong, but it was certainly solid and thoughtful and went through the issues, this district court opinion. How can we not at that point recognize as a matter of law that it's reasonable to rely on it at that point? Because if you do, you would violate the statute that entitles us to damages. For infringement. We're recognizing there's no infringement. We're entitled to a reasonable royalty, and an erroneous district court decision cannot trump our right for reasonable royalty. I think Judge Moore is correct. There's a difference here between damages and infringement. This is not a carve-out of damages. This is a question of whether there was any infringement during that one year or so period after the district court decision. Right. And it's a fact question. All right? And it can't be as a matter of law ruled because it would trump the statutory scheme. As a fact question, the state of mind of Iwasaki. Now, imagine hypothetically that it was a completely wrong decision. I mean, the court decided separate but equal is fine. Is that reasonable to rely on that? No. And you would clearly say it. And you would not be allowed to rely on that. Iwasaki says that he tried to bring this question up and tried to present this to the jury, but they were precluded from doing that. They were not? Correct. I disagree. I believe Iwasaki wanted this issue and this carve-out to be done as a legal issue, as a matter of law, perhaps as articulated by Judge Moore here. Just as a matter of law, you should rule that we did not induce, we can get a stipulation or a carve-out or instruction. All right? They agreed with that principle. At no point did they want to introduce any reliance on that because they had no evidence of reliance on that district court opinion because all of that evidence was privileged communications with counsel. What about obviousness? Of course, most inventions are combinations of old pieces, but here you had halogen, you had higher pressure, and why was the non-obviousness determination correct? Three reasons, Your Honor. First and foremost, the Holmes patent. The question put forth by Iwasaki is that Ellenbos teaches everything, just how much halogen do you put in to try to get a transport cycle working in an Ellenbos water-cooled lab, and I have one here, super hot, had to be water-cooled. All right. Holmes patent, the Holmes patent actually tried to do that, and it taught the world that you need a lot more halogen, and he didn't even get to a halogen transport cycle. He was able to increase the lifetime for other reasons. You're saying the Ellenbos description of the use of halogen is not very persuasive or relevant? It's not. All Ellenbos says is perhaps we can get a transport cycle working as they were able to do in the incandescent lamp, and Judge Lind is correct. Incandescent lamps are completely different operating conditions. They don't even operate. They operate maybe at one atmosphere. The problem is, and what Dr. Devonshire explains at length, is that these lamps are too hot to get a halogen transport cycle on. So whether you put in a little halogen, as claimed in the Phillips patent, or a lot more, you're never going to really get a halogen transport cycle. The reason why Phillips was able to do it is they didn't use this type of lamp at all. They used a very small electrostabilized lamp with something fundamentally different, and that's why they were able to get it to work. So the patent is not obvious for three reasons. One, you can't get it to work in an Ellenbos type of lamp, and the Holmes patent tells us that. And there is no fair way to read Ellenbos as saying use incandescent lamp halogen ranges. It's a brand-new argument raised on appeal. It's simply a fundamental new device, and the industry recognizes it. This is the first time in my career that I've had a patent that has won an Emmy Award for it. Patents win Emmy Awards? I thought that's entertainment. This invention, Your Honor, did. There's a technology branch to the Emmy Awards. It doesn't quite get telegraphed on the show, unfortunately, but the Emmys do award for fundamental technical advances in television, and that, Your Honor, is the Emmy Award. I can show you this. There's a picture of it, if you're curious, in the record. That's my time. Thank you very much. Thank you, Mr. DiMatteo. Mr. Roombridge has some rebuttal time. Thank you, Your Honor. Let's just start off where we left. The Emmy. The Emmy is a perfect example of what went wrong here. It wasn't the patent that won an Emmy. It was the product developed years later, covered by a whole raft of other patents that won the Emmy. The jury heard a great deal about the Emmy and that's symptomatic of what went wrong. That's where I started. Let's focus on the claim. He's saying it's symptomatic of juries. Right. The assertion from counsel just a couple of moments ago that the prior art doesn't disclose that the halogen cycle is wrong. This is what Ellen Barthes says. Avoiding lamp blackening has proved to be possible by introducing into the lamp a small amount of one of the halogens, iodine or bromine. Just as in incandescent lamps, through this the halogen cycle can be set to work, A6894. That assertion is just contrary. There's also the Japanese prior art reference, which again says in a mercury vapor discharge lamp it works. To the extent that there's an assertion that Iwasaki did not at trial make non-infringement arguments, that's just plain wrong. Of course, the whole discussion about the halogen and whether it's equivalent is a non-infringement argument. There was also another non-infringement argument based on the pressure limitation not raised in this appeal because we chose our issues, but certainly there was an active, vigorous dispute over infringement at trial. And finally, I'd just like to talk about damages. In response to the court's questions, counsel just said that what projector companies would be willing to pay was a relevant measure. That may be fine if you're suing a projector company, but Iwasaki isn't a projector company. It's never sold a projector. It gets no revenue from the projectors. And Mr. DiMatteo went on to say, well, it makes no difference. It makes a huge difference. The maximum price of one of these lamps is $90. The minimum price of a projector is $1,000. The difference in the damages base is vast. That's part of the issue we've got here was damages was awarded based on a set of revenue that the defendant never saw. And that cannot be right as a matter of law. I think my time is up, so I will stop. You can finish your sentence or paragraph it, if you wish. I think that's it, Your Honour. Unless the court has questions. Thank you, Mr. Groombridge. This will be taken under advisement.